IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PRUDENTIAL INSURANCE | : | CIVIL ACTION |
| COMPANY OF AMERICA, | : | |
|      Plaintiff | : | |
| | : | |
|    v. | : | NO. 04-0462 |
| | : | |
| PAUL M. PRUSKY, et al., | : | |
|      Defendants | : | |

**M E M O R A N D U M**

STENGEL, J.                                             March   31, 2008

Prudential Insurance Company of America filed this declaratory judgment action against Dr. Paul M. Prusky and his son Steven G. Prusky, sophisticated investors who own a life insurance policy through Prudential as an investment vehicle.  The plaintiff seeks a determination that Prudential's New Policies, which limit the method of making transfers between funds, do not violate the insurance contract.  The Pruskys' counterclaim alleged that these new policies violate their right to make daily transfers, which are necessary to implement their investment strategy of market timing.[1]

During the bench trial, the defendants moved at the close of the plaintiff's case-in-chief for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.  I declined to render a judgment at that stage, until the close of the evidence.  The parties have submitted proposed findings of fact and

---

[1] Market timing is a strategy that seeks to take advantage of short term changes in the investment market by making frequent transfers among mutual fund investment options on a daily basis.  Market timing is not illegal, although the SEC disfavors the practice.

conclusions of law.  For the following reasons, I will deny the defendants' motion

for judgment, and instead enter judgment in favor of the plaintiff and against the

defendants.

## I.  BACKGROUND

In 1997, Steven G. Prusky purchased a flexible premium survivorship

variable universal life insurance contract (the "Contract") from Prudential.  See

Amended Complaint ¶¶ 12, 19.  The terms of this Contract are the subject of this

litigation.  The parties were engaged in a previous lawsuit before the Honorable

Berle M. Schiller involving the same Contract.  In that suit, the Pruskys challenged

Prudential's decision to change the daily deadline for making transfers, i.e., the

"valuation time," from 4:15 to 4:00 p.m.  After a bench trial, Judge Schiller issued

extensive findings of fact and conclusions of law, ruling in favor of Prudential (the

"Prior Decision").  See Prusky v. Prudential Insurance Co. of America, No. 00-

2783, 2001 U.S. Dist. LEXIS 24080 (E.D. Pa. October 30, 2001) aff'd 44 Fed.

Appx. 545 (3d Cir. 2002).  On November 17, 2005, I determined that the parties

were bound by Judge Schiller's factual findings.  Prudential Ins. Co. of Am. v.

Prusky, No. 04-0462, 2005 U.S. Dist. LEXIS 28676 (E.D. Pa. Nov. 17, 2005) (the

"November 17, 2005 Decision").

In late 2003, Prudential notified policyholders that effective January 1,

2004,  "[a]s part of our general authority to restrict transfers," it would implement

New Transfer Policies.  See Amended Complaint Exhibit G.  These new

2

procedures state that ". . . we will allow you to effect up to 20 transfers each calendar year by telephone, fax, electronic means, or by mail.  Once that limit has been reached, we will accept subsequent transfer requests only if they are in a form acceptable to us, bear an original signature in ink, and are sent to us by U.S. regular mail.  After you have submitted 20 transfers in a calendar year, a subsequent transfer request by telephone, fax, or electronic means will be rejected."  Id.

Prudential filed an amended complaint in this court on April 23, 2004 seeking a declaratory judgement and injunctive relief to establish the parties rights and obligation under the Contract.  On December 1, 2004, the Pruskys counterclaimed for breach of contract.

## II.  FINDINGS OF FACT

1.     This case involves a dispute over the terms of an insurance contract issued by Prudential Insurance Company of America.  The contract in question is Prudential Survivorship Contract V000____[2] (the "Contract").  See Amended Complaint ¶ 1.

2.     The issue is whether Prudential breached the Contract by restricting the means by which defendants/counter-claimants Paul and Steven Prusky may submit requests to transfer funds among the Contract's investment options.  Prudential's current policy, which went into effect January 1, 2004, is to accept up

_____

[2]  Pursuant to Local Rule 5.1.3, the full Contract number is omitted here.

to twenty transfers each year submitted by mail, telephone, or facsimile. Additional transfers must be submitted by mail and bear an original signature in ink. Prudential contends that the Contract gives it discretion to specify the form in which contract owners like the Pruskys must submit their transfer requests. The Pruskys contend that they have a contractual right to submit transfer requests every day, and further that they implicitly have a right to transmit those transfer requests by an electronic means of communication.

3.      The parties litigated a prior action before the Honorable Berle M. Schiller involving the same Contract. In that suit, the Pruskys challenged Prudential's decision to change the daily deadline for making transfers, i.e., the "valuation time," from 4:15 to 4:00 p.m., and argued that Prudential's decision breached the Contract. After a bench trial, Judge Schiller issued detailed findings of fact and conclusions of law in support of his decision that Prudential had not breached the Contract. See Prior Decision. This Court has already determined that the Pruskys are bound by Judge Schiller's factual findings. See Nov. 17, 2005 Decision; see also Prudential Ins. Co. of America v. Prusky, 473 F. Supp. 2d 629, 631 (E.D. Pa. 2007) (the "February 8, 2007 Decision").

A.      **The Parties**

4.      Prudential is a life insurance company organized under the laws of the State of New Jersey. It maintains its principal offices in Newark, New Jersey, and regularly transacts and conducts business in Pennsylvania. See Feb. 8, 2007

4

Decision, 473 F. Supp. 2d at 630.

5.     Defendants and counter-claimants Paul M. Prusky ("Dr. Prusky" or "Paul Prusky") and Steven G. Prusky ("Mr. Prusky" or "Steven Prusky" and, with Dr. Prusky, the "Pruskys") are Pennsylvania residents.  See Amended Complaint ¶ 9.

6.     At all relevant times, Dr. Prusky has been President and owner of Windsor Securities, Inc. ("Windsor") and has had a controlling interest in MFI Associates ("MFI").  See Amended Complaint ¶ 15; Answer ¶ 15.  At all relevant times, Steven Prusky has been the Vice President of Windsor.  See N.T. 8/22/07 at 11.

7.     Windsor and MFI are each registered with the Securities and Exchange Commission (the "SEC") as investment advisers and collectively have over $200 million under management.  Windsor invests money on its own account and for clients in retail mutual funds and variable annuity contracts that invest in mutual funds.  See Amended Complaint ¶ 15.  Windsor is also registered with the National Association of Securities Dealers (the "NASD") as a broker.  See Prior Decision, Finding of Fact 7.

8.     The Pruskys are the current owners, in their capacities as trustees of the MFI Associates, Ltd. Profit Sharing Plan (the "Plan"), of the Contract.  See Feb. 10, 2005 Stipulation & Order (the "Feb. 10, 2005 Order").  Prudential brought this action against the Pruskys in their capacity as trustees of the Plan.  See

5

Amended Complaint ¶ 10.

9.      Steven Prusky was the original owner of the Contract on behalf of a different trust.  The Contract was subsequently sold to the Plan.  See N.T. 8/22/07 at 11.

10.      Although Steven Prusky was the applicant for and original owner of the Contract, the Pruskys acted in concert in the negotiation and acquisition of the Contract.  See Prior Decision, Finding of Fact 9.

11.      During any relevant periods in which Steven Prusky was not an owner of the Contract, Steven Prusky was Paul Prusky's authorized agent in Prusky's capacity as owner of the Contract.  See Amended Complaint ¶¶ 12-13; see also Answer ¶¶ 12-13.

12.      Since at least June 2000, Steven Prusky has been the "broker of record" for the Contract.  In that capacity, he receives, directly or indirectly, any commissions payable under the Contract since he became broker of record.  See Prior Decision, Finding of Fact 12.

13.      Paul and Steven Prusky are sophisticated investors in the business of managing their own and other people's investments.  Both Paul and Steven Prusky have many years' experience investing in mutual funds and variable life insurance products.  See Feb. 8, 2007 Decision, 473 F. Supp. 2d at 631; see also Prior Decision, Finding of Fact 13.

14.      The Pruskys engage in an investment strategy commonly referred to

6

as "market timing."  Their strategy attempts to take advantage of short-term

changes in the investment markets by making frequent transfers between

investment options.  <u>See</u> Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at

* 3; <u>see also</u> Feb. 8, 2007 Decision, 473 F. Supp. 2d at 631.

      15.    Other than telling Prudential that they wanted to trade frequently,

that they wanted to trade by telephone and facsimile, and that they wanted to trade

until 4:15 p.m., the Pruskys did not describe their trading strategy to Prudential.

<u>See</u> N.T. 2/20/08 at 39, 55-56, and 69-70; <u>see also</u> N.T. 2/21/08 at 90-92.

      16.    The Pruskys have considerable experience negotiating with

insurance companies to obtain the features they want in the variable insurance

contracts through which they intend to conduct their market-timing activities.

They have negotiated with, and purchased variable insurance contracts from,

insurance companies including Phoenix Life, ReliaStar, John Hancock, Allstate,

and Aetna, and have also purchased a variable insurance contract from Hartford.

<u>See</u> N.T. 8/22/07 at 41; <u>see also</u> N.T. 2/19/08 at 10-12, 21-22.  They have also

sued each of these insurance companies, contending that each has breached the

Contract.  <u>See</u> Amended Complaint ¶ 86-94; <u>see also</u> Answer ¶ 86-94.

      17.    The design requirements the Pruskys negotiate for with these

insurance companies typically include (1) an unlimited number of daily transfers;

(2) the ability to place transfer requests up until 4:15 p.m.; (3) the ability to submit

those transfer requests electronically; and (4) the ability to delegate the authority to

7

submit those transfers to others, including the Pruskys' employees.  See N.T. 2/19/08 at 39; see also N.T. 8/23/07 at 71-72.

18.    At all relevant times, the Pruskys have harbored a deep suspicion and mistrust of insurance companies.  See N.T. 8/23/07 at 64; see also N.T. 2/19/08 at 21-22.

19.    Based upon their experience, the Pruskys knew what assurances they needed to obtain from an insurance company to ensure a contract they purchased met all of their design requirements.

20.    William Van Pelt, III ("Van Pelt III") and his son William Van Pelt IV ("Van Pelt IV" and, collectively with Van Pelt III, the "Van Pelts") were brokers hired by the Pruskys.  Van Pelt III was the original "broker of record" on the Contract.  See Prior Decision, Findings of Fact 18-19.

21.    The Van Pelts acted as the Pruskys' agents for the negotiation and acquisition of the Contract.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 9109, at *12-*14, *18.

22.    Thomas Beresford ("Beresford") has at all relevant times been a Prudential employee.  See N.T. 2/20/08 at 53-54.  In 1997, he held the job title of Functional Vice President.  Id. at 55.

**B.    The Contract**

23.    The Contract is a flexible premium survivorship variable universal life ("SVUL") contract issued by Prudential.  See Amended Complaint ¶ 19; see

8

<u>also</u> Answer ¶ 19; Counterclaim ¶ 6.

24.     The insureds under the Contract are Paul Prusky and his wife, Susan

Prusky.  <u>See</u> Amended Complaint ¶ 122; Answer ¶ 122; Counterclaim ¶ 1.

25.     The Contract is integrated and consists of a standardized form

policy, certain portions of which vary among different contracts, and an attached

application.  <u>See</u> Prior Decision, Finding of Fact 29; <u>see also</u> July 22, 2005

Decision, 413 F. Supp. 2d 489, 491-492; Feb. 8, 2007 Decision, 473 F. Supp. 2d at

633; N.T. 8/21/07 at 102-104.

26.     The Contract states, in a provision entitled "Entire Contract," as

follows: "This policy and any attached copy of an application, including an

application requesting a change, form the entire contract."  <u>See</u> N.T. 8/21/07 at

107.  This provision is required by Pennsylvania statute.  <u>See</u> 40 Pa. Stat. Ann. §

510(d).  Both Paul Prusky and Steven Prusky read this provision before signing the

Contract.  <u>See</u> Prior Decision, Finding of Fact 71.

27.     The Contract also includes a provision entitled "Contract

Modifications," which states, "Only a Prudential officer with the rank or title of

Vice President may agree to modify this contract, and then only in writing."  <u>See</u>

Prior Decision, Finding of Fact 73; <u>see also</u> N.T. 8/21/07 at 107-108.

28.     Under the heading "TRANSFERS," the Contract provides:

> You have the right to transfer amounts into or out of
> investment options up to twelve times in each contract
> year without charge if the contract is not in default,

9

> subject to certain restrictions depending on an
> investment's class.  We may charge for additional
> transfers in any contract year as we state under
> Adjustments to the Contract Fund…. To make a
> transfer, you must ask us in a form that meets our
> needs.  Unless otherwise restricted, the transfer will
> take effect on the date we receive your notice at our
> Home Office.

See Def. Ex. 6 at 14.

29.     The Contract permitted a contract owner to make twelve transfers among subaccounts in a Contract Year without a fee.  For each transfer over twelve, the Contract permitted, but did not require, Prudential to impose a $25 fee. See Prior Decision, Finding of Fact 77; see also N.T. 8/21/07 at 110.

30.     At the time the Contract was formed, it was Prudential's practice to permit contract owners to submit transfer requests by telephone and facsimile, as well as by mail; Prudential did not accept transfer requests submitted by other electronic means.  See N.T. 2/20/08 at 110.  The Pruskys' practice at that time was to submit transfer requests by facsimile or telephone.  See N.T. 2/19/08 at 94-95; see also N.T. 3/10/08 at 68.

### C.     Mutual Fund Investment Options Under The Contract

31.     Under a Prudential SVUL contract, premium payments that the owner makes become, after deduction of any applicable charges, part of the "Contract Fund."  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *2.

32.     The Contract Fund may be invested in, among other things, interests in one or more of a number of investment options available in the Prudential Variable Appreciable Account (the "SVUL Account").  See Def. Ex 6t at 3D; see also Amended Complaint ¶ 27; Answer ¶ 27; Counterclaim ¶ 11.

33.     With one exception, the assets of each investment option are invested, in turn, in a corresponding portfolio of an underlying open-end investment company, The Prudential Series Fund, Inc. (the "Series Fund").  One investment option is invested in a portfolio of another underlying open-end investment company, Janus Aspen Series.  See Amended Complaint ¶ 28; Answer ¶ 28.  Neither the Series Fund nor the Janus Aspen Series fund is a party to the Contract.  See Prior Decision, Finding of Fact 45; see also N.T. 8/21/07 at 112-113.

34.     Prudential is not a beneficial owner of the Series Fund; rather, the Series Fund is beneficially owned by tens of thousands of owners of variable life insurance contracts and variable annuity contracts issued by Prudential, its affiliates, and several other insurance companies.  See Prior Decision, Finding of Fact 49.

35.     Two separate types of securities relate to a Prudential SVUL contract:  (a) interests in the investment options available in the SVUL Account, which are then owned by the contract owner and (b) indirectly, shares of the portfolios of the Series Fund and of the Janus Aspen Series, in which those

11

investment options invest for the benefit of contract owners.  See Prior Decision, Finding of Fact 41.

36.     The SVUL Account is registered with the SEC as a "unit investment trust," which is a type of "investment company," both of which are terms defined under the 1940 Act.  See Prior Decision, Finding of Fact 42.

37.     The Series Fund is registered with the SEC as an open-end investment company, which is also a type of investment company.  See Prior Decision, Finding of Fact 43.  The Janus Aspen Fund is also registered with the SEC as an open-end investment company.  See Amended Complaint ¶ 31; Answer ¶ 31.

38.     Open-end investment companies are popularly referred to as "mutual funds."  However, unlike retail mutual funds, a mutual fund like the Series Fund or Janus Aspen Series that serves as an investment vehicle for variable insurance and variable annuity contracts is generally not available for direct investment by the retail public.  See Prior Decision, Finding of Fact 44.

39.     The value of the Contract Fund varies from day to day based upon: (a) the investment performance of the investment options; (b) the deduction of any applicable charges or fees under the Contract; and, (c) additional premium payments made by the owner.  See Prior Decision, Finding of Fact 38.

40.     The owner of a Prudential SVUL contract determines the initial allocation of the Contract Fund among the investment options.  See Prior Decision,

Finding of Fact 61.

41.     The SVUL Policy owner may then change the allocation among the investment options by making transfers.  See Prior Decision, Finding of Fact 62.

**D.     Contract Negotiations**

42.     Beginning in 1996, the Pruskys embarked on a plan to obtain variable life insurance contracts from various insurance companies.  The Pruskys' purpose was estate planning for Dr. Prusky and his wife.

43.     Prior to negotiations with Prudential, the Pruskys were aware of growing hostility in the retail mutual fund industry toward market timing.  See N.T. 2/19/08 at 7; see also N.T. 8/22/07 at 21, 23-25, 28-29, 30.  It was because of this growing hostility that the Pruskys began investing in variable insurance contracts, where they believed their trading rights would be governed by contract, rather than directly in retail mutual funds where they believed any particular trading rights could not be guaranteed.  The Pruskys believed it was necessary for them to obtain enforceable guarantees regarding the design criteria they deemed important to implement their market-timing investment strategy in variable insurance contracts.  See N.T. 8/22/07 at 167; see also N.T. 2/19/08 at 7-10.

44.     Based on their extensive experience, in 1997 the Pruskys believed they knew what assurances they needed to obtain from insurance companies offering variable life insurance contracts in order to ensure they could use their investment strategy for the life of the Contract.  See N.T. 2/19/08 at 23.

13

45.     When the Pruskys wished to ensure that they could implement their investment strategy in connection with a variable life insurance policy, the Pruskys followed a pattern and practice of attempting to obtain a signed, written guarantee from the insurance company regarding each element of their design criteria before purchasing it.  See N.T. 8/22/07 at 164, 167.

46.     Among other things, the Pruskys believed at the time of Contract formation that to implement their investment strategy, they required written assurances from high-ranking insurance company officials that (a) they could trade as frequently as daily, and (b) that they could submit those transfers by telephone, fax, or other instantaneous means of communication.  The Pruskys understood prior to and at the time of Contract formation that they needed both guarantees to ensure that they could continue to use their investment strategy indefinitely and without restriction.  See N.T. 8/23/07 at 71-72; see also N.T. 2/19/08 at 39-40, 45; N.T. 8/22/07 at 68-70.

47.     Likewise, the Van Pelts, the Pruskys' agents, understood that the Pruskys wanted separate assurances that (a) they could make daily trades, and (b) that they could submit those transfers by telephone, fax or other instantaneous means of communication.  See Van Pelt IV Dep. at 55.

48.     The Pruskys followed this pattern and practice of seeking written assurances that they would be allowed to (1) submit transfer requests each day the market was open; and (2) use facsimile, telephone or other electronic means of

14

communication to transmit those transfer requests with respect to contracts they sought from several other insurance companies from whom they also purchased variable products designed to be components of the same comprehensive estate plan for Paul and Susan Prusky.  See N.T. 2/19/08 at 159-160; see also N.T. 8/22/07 at 41-45, 47-56, 62-64.

49.    Prior to the formation of the Contract with Prudential, in negotiations with John Hancock Mutual Life Insurance Company concerning a flexible premium variable life survivorship insurance policy (sometimes referred to as a "Variable Estate Protection Policy"), the Pruskys sought and received separate written assurances that they could make an unlimited number of trades and submit those requests electronically.  Specifically, the Pruskys sought and received a written assurance from Henry Shaw, John Hancock's President, that "although paragraph 14 of the John Hancock Variable Estate Protection policy reads that we reserve the right to limit the number and frequency of fund transfers, we will not at any time impose these limits on your policy."  The Pruskys also sought and received a separate promise that:

> John Hancock Variable Life Insurance Company will delete from the prospectus of the Variable Estate Protection Policy the parenthetical about fax requests being considered telephone requests and bound by the conditions of the telephone authorization form.  In this way, if the telephone transfer option is eliminated at some future date, you may continue to send transfer requests by fax.

This assurance that transfers could be made by electronic means was bolstered by

an additional guarantee from Mr. Shaw:

> The Variable Estate Protection prospectus states under
> the Telephone Transfer section that if the fax option
> request becomes unavailable, another means of
> telecommunication will be substituted.  The other
> means of telecommunications referred to are those
> which would be readily available to the general public.

See N.T. 2/19/08 at 129-131, 135-138; see also N.T. 2/20/08 at 32.

50.     In negotiations with American General Insurance Company over a

variable life insurance policy conducted by the Van Pelts contemporaneously with

the Pruskys' negotiations with Prudential over the Contract, the Pruskys sought

and received separate assurances that American General would allow "unlimited

daily trades" and "the ability to communicate trading instructions via telephone or

other electronic means."  See Van Pelt IV Dep. at 54-55, 118-121.

51.     In negotiations with Phoenix Life Insurance Company over a

variable life insurance policy, the Pruskys sought and received separate written

assurances that (1) Phoenix will allow unlimited sub-account transfers, and (2)

Phoenix will accept both phone and faxed sub-account transfer requests.  See N.T.

2/19/08 at 138-143, 152.

52.     In negotiating Flexible Premium Variable Life Insurance contracts

with ReliaStar Life Insurance Company, the Pruskys sought and received

memoranda in which ReliaStar agreed (a) that transfers among subaccounts under

16

the Contract may take place as often as once per day, and (b) that transfer requests may be made in writing to the home office of ReliaStar or, at the policyholder's choice, *via* telephone, or fax or other electronic substitute.  See N.T. 2/19/08 at 152-153, 154-157.

53.    The Pruskys sought and received a written assurance from Aetna Retirement Services that "we do, as a matter of course, accept trade requests from the policy owner/authorized agent submitted *via* fax."  See Exhibit U41.  The Pruskys also sought and received a separate assurance that "there is no limit on the number of trades that can be made, though we do reserve the right, as stated in the prospectus, to charge a nominal fee but we have never exercised the right to impose the charge."  Id.; see also N.T. 2/19/08 at 157-159.

54.    In May 1997, the Van Pelts decided to contact Prudential on behalf of the Pruskys because the Van Pelts knew that Prudential had previously underwritten very large life insurance policies without requiring reinsurance.  The Van Pelts considered Prudential's ability to do so important because the reinsurance market previously had imposed obstacles to the acquisition of a satisfactory insurance policy.  See Prior Decision, Finding of Fact 126. Reinsurance requirements stymied Dr. Prusky's attempt to secure an $80 million insurance policy from Hartford months earlier.  See N.T. 2/19/08 at 26-27.

55.    On August 26, 1997, Dr. Prusky spoke with one or both of the Van Pelts about a number of topics relating to the potential acquisition of a variable life

insurance contract from Prudential, including the design criteria for SVUL products he had discussed previously with the Pruskys.  See Prior Decision, Findings of Fact 145-46.

56.     On August 27, 1997, Van Pelt III telephoned Beresford to ask questions in connection with the topics raised in the Van Pelts' August 26, 1997 conversation with Prusky.  Beresford took handwritten notes of this conversation. See Prior Decision, Finding of Fact 148.

57.     The Pruskys did not communicate directly with Prudential or Beresford concerning the manner in which transfers could be submitted.  Rather, the Pruskys' communications with Prudential concerning how the Pruskys could submit transfers under the Contract were through the Van Pelts.  See N.T. 2/20/08 at 39, 55-56; see also N.T. 8/23/07 at 22-23.

58.     In the August 27, 1997 conversation, Van Pelt III asked Beresford for written confirmation about several of the design criteria, including (1) that the Contract owner could make daily transfers for the life of the contract, (2) that the Trust had the ability to delegate investment-decision authority to a third party; (3) whether the transfer cut-off time was 4:15 p.m.; and (4) whether Prudential accepted transfer instructions by facsimile.  In his questions regarding the 4:15 p.m. transfer cut-off and facsimile transfers, Van Pelt III did not mention "for the life of the contract."  See Prior Decision, Findings of Fact 149-50; see also N.T. 2/20/08 at 66, 68, 70-71.  During the August 27, 1997 conversation, the Van Pelts

18

never described the Pruskys' investment strategy, never linked the importance of

particular criteria to the success of their practice, and never asked for a guarantee

that the Pruskys could market-time indefinitely.  See N.T. 2/20/08 at 69-70, 90.

59.     Beresford understood the request for daily transfers to mean that the

Pruskys did not want a limit on the number of transfers they might make.  See N.T.

2/20/08 at 66-67, 68-69.  Beresford did not understand the request for facsimiles as

seeking a life of the contract guarantee.  See N.T. 2/20/08 at 66-67, 70, 72-75.

Beresford did not understand the phrase "daily transfers" to include an ability to

submit trades instantaneously.  See N.T. 2/20/08 at 66-67, 68-69, 72-73; see also

N.T. 2/21/08 at 89.

60.     Following his telephone conversation with Van Pelt III, Beresford

consulted with another Prudential employee with expertise about administrative

matters concerning the SVUL policy.  That employee confirmed that the transfer

cut-off time was 4:15 p.m., and that Prudential accepted transfer instructions by

facsimile.  See Prior Decision, Finding of Fact 151; see also N.T. 2/20/08 at 66-67,

73-74.  Beresford also learned that the Contract did not place an upper limit on the

number of transfers a contract owner could make.  See N.T. 2/20/08 at 75-78, 82.

61.     Beresford drafted a letter addressed to Prusky dated August 28, 1997

that answered the questions Van Pelt III had asked.  "The draft letter … addressed

the questions Van Pelt III had raised in the August 27, 1997 telephone

conversation.  Among other things, it stated, 'daily transfers have never been

prohibited;' that 'any [transfer] request received in good order before 4:15 p.m. New York City time will be processed at the unit values determined at 4:15 p.m. that day;' and that 'Prudential does accept [facsimiles] as valid instructions for making transfers.'"  <u>See</u> Prior Decision, Finding of Fact 153.

62.     After reviewing Beresford's draft that same day (August 28, 1997), Van Pelt III telephoned Beresford to request that Beresford revise the letter, among other ways, to add the following sentence: "Daily transfers will be allow[ed] throughout the life of the contract."  <u>See</u> Prior Decision, Finding of Fact 153; <u>see also</u> N.T. 2/20/08 at 76, 78.  Beresford acceded to this request because he believed that Prudential did not limit the number of transfers that a contract owner could make, so he did not view the change as significant.  <u>Id.</u> at 79-82.  Beresford understood the request regarding daily transfers to be separate and distinct from the request regarding acceptance of facsimiles.  <u>Id.</u> at 83.  Van Pelt III did not ask Beresford to change the language regarding the means of communicating requests. <u>Id.</u> at 79-83.

63.     Still later on August 28, 1997, Carol Cole, Prudential's case manager for new business at the time, sent, and the Van Pelts received, a final version of the August 28, 1997 letter, which was signed by Johnston."[3]  <u>See</u> Prior Decision, Finding of Fact 26, 155.

_____

[3] David Johnston is a Prudential employee with the job title of director.  <u>See</u> Prior Decision, Finding of Fact 21.

64.     Beresford did not intend for the August 28, 1997 letter to modify the SVUL contract, did not believe he or Johnston had the authority to do so, and would not have attempted to do so without obtaining authorizations from the highest levels at Prudential.  See N.T. 2/20/08 at 110, 112, 114.

65.     Beresford did not promise and did not intend to promise, by stating that "daily transfers will be allowed for the life of the contract," that Prudential would permit transfer requests to be made by an instantaneous means for the life of the Contract.  Id. at 82, 87.

66.     Beresford also did not promise and did not intend to promise that the 4:15 transfer cut-off time would remain unchanged or that Prudential would permit transfers to be submitted by facsimile or any other electronic means for the life of the Contract.  See Prior Decision, Finding of Fact 157-58; see also N.T. 2/20/08 at 86-87.

67.     Prudential did not promise, and did not intend to promise, in the August 28, 1997 letter that the 4:15 p.m. transfer cut-off time would remain the same for the life of the contract or that Prudential would always offer facsimile or other electronic means of transmitting transfers.  See Prior Decision, Finding of Fact 158; see also N.T. 2/20/08 at 86-87.

68.     Prudential did not promise, and did not intend to promise, in the August 28, 1997 letter that Prudential would allow the Pruskys to engage in market-timing for the life of the Contract.  See N.T. 2/20/08 at 90.

21

69.    On September 3, 1997, Steven Prusky sent Van Pelt III *via* facsimile, and the Van Pelts received, a letter, which stated in part:

> Please note that a condition for purchasing this coverage is a signed, enforceable letter from Prudential that guarantees the permanence of the rights to: (1) transfer[] assets among all funds every day; (2) enact such transfers by telephone; (3) make such calls as late as 4:15 p.m., (4) appoint an agent to authorize these transfers. If such a letter has been sent, I have not seen it. Kindly fax me another copy.

See Prior Decision, Finding of Fact 160.

70.    On September 3, 1997, after receiving Steven Prusky's September 3, 1997 letter, the Van Pelts sent the August 28, 1997 letter *via* facsimile to Steven Prusky, who received it that same day.  See Prior Decision, Finding of Fact 161.

71.    On September 4, 1997, after reviewing the August 28, 1997 letter, Steven Prusky wrote a letter to Van Pelt III.  See Prior Decision, Finding of Fact 162; see also N.T. 8/22/07 at 109-111.

72.    Steven Prusky observed in his September 4, 1997 letter that although the August 28, 1997 letter "guarantees daily transfers, it does not explicitly guarantee daily telephone transfers."  Steven Prusky accordingly instructed Van Pelt III to have the August 28, 1997 letter "amended accordingly" to specify that daily telephone transfers would be permitted for the life of the Contract.  See Def. Ex. 44.

73.    Steven Prusky also instructed Van Pelt III to obtain written

22

assurances from Prudential both "that the cut-off time for making transfers will not change for the life of the contract" and "that facsimiles will be accepted for the life of the contract." See Prior Decision, Finding of Fact 164.

74.     Steven Prusky instructed Van Pelt III that "[o]f course, I will need originals of [Prudential's] letters." See Def. Ex. 44.

75.     Steven Prusky understood that the August 28, 1997 letter did not provide him with what he wanted: signed enforceable guarantees that he could make daily transfers by telephone, that he could make daily transfers by facsimile, and that the cut-off time for making transfers would not change. See Prior Decision, Finding of Fact 165; see also N.T. 3/10/08 at 76-78. Steven Prusky understood that the August 28, 1997 letter did not guarantee him the right to market-time under the Contract. See N.T. 3/10/08 at 76-77.

76.     The Pruskys understood they needed to obtain an enforceable guarantee that they could submit transfer by telephone and facsimile for the life of the Contract because without such a guarantee, Prudential retained discretion under the Contract to determine the form in which transfers had to be submitted and could exercise that discretion to stop accepting transfers submitted in electronic form. See Def. Ex.'s 10 and 44.

77.     In a letter dated Thursday, September 10, 1997, Van Pelt III conveyed to Prudential Steven Prusky's requests for changes to the August 28, 1997 letter. Van Pelt III attached to his letter a copy of Steven Prusky's September

4, 1997 letter.  See Prior Decision, Finding of Fact 169; see also N.T. 3/10/08 at 80-82.

78.    Van Pelt III proposed in his September 10, 1997 letter that Prudential "[r]eplace sentence 2, paragraph 1, section 2" of the August 28, 1997 letter [which read "Daily transfers will be allowed throughout the life of the contract"] with the following sentence: "Daily telephone, written and facsimile transfer requests will be allowed throughout the life of the contract."  See Def. Ex. 45.  Van Pelt III also asked that the 4:15 p.m. transfer cut-off time would remain the same "for the life of the contract."  See Prior Decision, Finding of Fact 170-71.

79.    The Pruskys' requested changes to the August 28, 1997 letter would have had the effect of eliminating the discretion reserved to Prudential under the Contract both (a) to dictate the form in which transfer requests were to be submitted, and (b) to impose and enforce restrictions on the timing of when transfers become effective.

80.    Beresford reasonably understood the Van Pelt September 10, 1997 letter and Steven Prusky's September 4, 1997 letter to mean that the Pruskys wanted more than an unlimited number of transfers.  They also wanted a guarantee that they could transmit those transfers by an electronic means for the life of the Contract.  See N.T. 2/20/08 at 94, 104-105, 108-111.

81.    On Monday, September 15, 1997, a Prudential employee sent, and Van Pelt III received, a facsimile stating that Prudential would not guarantee the

permanence of the ability to transmit transfers by facsimile or telephone or the

4:15 transfer cut-off time.  The letter read:

> "With regard to the last three items (all of which
> essential[ly] request that we add 'for the life of the
> contract' to the assurance we have provided),
> Prudential cannot make such representations with
> regards to administrative business matters. While it is
> our intent to continue these business practices in the
> future, there may come a time when a modification to
> our practices would be required due [to] legal,
> technological or business reasons. We cannot provide a
> written guarantee 'for the life of the contract' which
> would not allow us to adjust our practice in a manner
> most prudent for all our policyholders."

See Prior Decision, Finding of Fact 173; see also N.T. 2/20/08 at 115.

82.     On September 16, 1997, Prudential sent *via* facsimile, and the Van

Pelts received, a signed letter that refused to guarantee certain administrative

business practices for the life of the Contract.  In wording virtually identical to the

September 15, 1997 fax, the letter expressly reserved the right to change for "legal,

technological, or business reasons" administrative business practices such as

accepting transfers submitted by facsimile or telephone.  See Prior Decision,

Finding of Fact 174.

83.     After learning that Prudential had refused to provide the life-of-the-

contract guarantees he had sought on behalf of the Pruskys, Van Pelt III attempted

during a September 16, 1997 telephone conference with Beresford and others to

persuade Prudential to adopt alternative language respecting the communication of

25

transfer instructions by facsimile.  See Prior Decision, Finding of Fact 180; see also N.T. 2/20/08 at 121.

84.     Later that same day, September 16, 1997, Van Pelt IV followed up with a facsimile to Beresford proposing that Prudential add language to the contract permitting:

> "daily transfer requests received by facsimile so long
> as facsimile technology continues to be widely used in
> business office environments and making such requests
> by facsimile continues to be permitted by law.  In the
> event that facsimile technology is no longer widely
> used in business office environments, Prudential will
> accept requests via a successor technology, provided
> that such technology is generally recognized to exist."

See Feb. 8, 2007 Decision, 473 F. Supp. 2d at 632.

85.     Paul Prusky testified that a request for successor technology covered all possible means of electronic communications.  See N.T. 2/19/08 at 155-157.

86.     Prudential refused to provide any assurance that Prudential would make any "successor technology" available, and refused any other alternatives. See Prior Decision, Finding of Fact 181; see also N.T. 2/20/08 at 123-124.  The Pruskys could not have reasonably understood that Prudential had guaranteed a right to communicate transfer requests by telephone facsimile, or successor technology.  See Feb. 8, 2007 Decision, 473 F. Supp. 2d at 638.

87.     Prudential reasonably understood the Pruskys' requests for assurances that they could make transfers by facsimile or telephone and that they

could make transfers until 4:15 p.m. each day as the language the Pruskys sought in order to ensure that they could make transfer requests by instantaneous means of communication as late in the day as possible.  Prudential needed to retain its flexibility regarding these matters, and accordingly refused to provide the requested guarantees.  See N.T. 2/20/08 at 115, 118-120, 142-143; see also N.T. 2/21/08 at 93-94.

88.    Paul and Steven Prusky were aware of Prudential's refusal to guarantee the requested administrative features for the life of the Contract as early as September 16, 1997, and were aware of Van Pelt III's attempts to negotiate alternatives to the rejected requests for guarantees.  See Prior Decision, Finding of Fact 183.

89.    On September 18, 1997, Prudential sent via facsimile, and the Van Pelts received, a signed, similar version of the letter sent by Mr. Johnston on September 16, 1997.  See Prior Decision, Finding of Fact 184.

90.    The September 18, 1997 letter stated that "daily transfers are allowed throughout the life of the Contract," but in the very next sentence continued to refuse to guarantee that Prudential would accept transfers transmitted by facsimile or telephone for the life of the Contract, or that the 4:15 p.m. transfer cut-off time would remain the same for the life of the Contract.  The letter stated that although "it is our intent to continue these business practices in the future, there may come a time when a modification to our practices would be made due to legal,

technological or business reasons." See Def. Ex #49.  The letter did not include the Van Pelts' requested language regarding a "successor technology."

91.    The Van Pelts discussed the September 16, 1997 and September 18, 1997 letters with Paul and Steven Prusky.  See Prior Decision, Finding of Fact 192.

92.    Beresford made the changes between the September 16 letter and the September 18 letter, including his reemphasis that "daily transfers are allowed throughout the life of the contract," at the request of the Van Pelts.  See N.T. 2/20/08 at 132-138.

93.    Beresford did not intend for the September 18, 1997 letter to modify the SVUL contract and he did not believe he had the authority to do so.  See N.T. 2/20/08 at 112, 141.

94.    The September 18, 1997 letter reiterated Prudential's understanding that daily transfers and an instantaneous means of submitting transfers were two distinct matters.  See N.T. 2/20/08 at 133, 138-141.

95.    The Van Pelts sent the original of the September 18, 1997 letter to Steven Prusky.  See Prior Decision, Finding of Fact 191.  The Pruskys received the September 18, 1997 letter.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *16-17.

96.    Nonetheless, the Pruskys continue to deny their receipt of the September 18, 1997 letter.  See N.T. 2/19/08 at 113, 119-120; see also N.T.

8/22/07 at 156, 160; N.T. 8/23/07 at 58-59.

97.   The Pruskys' testimony in this and the Prior Lawsuit establishes their understanding that the September 18, 1997 letter denied them the guarantees they wanted.  See N.T. 2/19/08 at 33-34, 120-122; see also N.T. 8/23/07 at 82.

98.   With the knowledge of Paul Prusky and Steven Prusky, the Van Pelts continued to negotiate with Prudential on behalf of the Pruskys regarding administrative features of the Contract after September 18, 1997.  See Prior Decision, Finding of Fact 196.

99.   As late as September 30, 1997, the Van Pelts and the Pruskys continued to attempt to negotiate with Prudential to ensure that some electronic means of communication would be available to submit transfers.  See N.T. 2/19/08 at 126-127; see also N.T. 2/21/08 at 55-57.

100.   Those continued negotiations never resulted in Prudential providing the requested guarantees, including Steven Prusky's request that Prudential guarantee that it would for the life of the Contract accept transfer instructions transmitted by facsimile or telephone, or that Prudential would accept transfer instructions until 4:15 p.m. each day.  See Prior Decision, Finding of Fact 197; see also N.T. 2/20/08 at 142-143.

101.   At the time the Contract became effective, the Pruskys could not have rationally believed that the Contract included a promise that they would be able to make transfers *via* phone, facsimile, or successor technology for the life of

the Contract, or that the statement that "daily transfers are allowed throughout the life of the contract" meant that they had the right to make transfers by any instantaneous means.  See Feb. 8, 2007 Decision, 473 F. Supp. 2d at 638.

102.    By rejecting the language the Pruskys sought regarding the medium by which transfers could be submitted, Prudential reaffirmed its discretion to determine the form in which the Pruskys could submit transfer requests.  See N.T. 2/20/08 at 142-144.

103.    The Contract was formed on November 8, 1997.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at * 8-*9, *11.

104.    Although the Van Pelts and the Pruskys were aware that Prudential continued to refuse to guarantee that it would accept transfer requests by telephone, facsimile, telephone or any successor technology for the life of the Contract, Steven Prusky accepted the Contract in November 1997.  See Prior Decision, Finding of Fact 183, 198.

105.    At the time the Contract became effective, Steven Prusky did not believe and could not reasonably have believed that he had an enforceable guarantee that he could make transfers by facsimile, telephone or other instantaneous means of communication for the life of the Contract.  See Prior Decision, Finding of Fact 215.

**E.      Trade Usage and Practice in 1997**

106.    In May 1997, many variable product issuers and mutual funds had a

practice of either restricting transfers by various means, preserving the flexibility to impose restrictions on transfers, or both.  <u>See</u> N.T. 8/23/07 at 116.  The methods used were not uniform and varied widely from entity to entity.  <u>Id.</u> at 119-120, 153.

107.   In 1997, one means to restrict transfers was to restrict the medium by which transfers might be submitted, including restrictions on the ability to submit transfers by telephone or facsimile.  <u>Id.</u> at 119-120.

108.   Many variable product issuers and mutual funds preserved their ability to impose restrictions on transfer orders in order to address changing or unanticipated circumstances.  <u>Id.</u> at 118-119.  For example, securities, tax or insurance law business practices; regulatory environments; or technology could change.  <u>Id.</u>

### F.   <u>Prudential Restrictions on Market Timing in Retail Funds</u>

109.   In 1997, Prudential provided investment and distribution services to certain retail mutual funds available for investment by the public.  At all relevant times, Prudential Retail Mutual Funds were not available as investment options under Prudential variable insurance contracts.  <u>See</u> N.T. 2/19/08 at 16-17.

110.   On or around September 8, 1997, the Pruskys became aware that Prudential was becoming more hostile toward market timing.  The Pruskys, who were already investors in Prudential Retail Mutual Funds, learned that if they wanted to continue market timing in those retail funds, they would have to execute

31

an agreement with Prudential that restricted the size, i.e., the dollar amount, of their trades.  See N.T. 2/19/08 at 17-18; see also N.T. 2/20/08 at 46-47.

111.    Paul Prusky executed an agreement with Prudential on September 10, 1997, that restricted the size, but not the number, of trades Paul Prusky could make in the retail funds affiliated with Prudential.  Dr. Prusky understood that, although he could continue to trade daily, his ability to market time in the Prudential retail funds was thereafter restricted.  See N.T. 2/19/08 at 18-21.

G.    **Increased Efforts to Discourage Market Timing**

112.    Beginning in approximately 2003, market timing in mutual funds and variable insurance contracts became the subject of increased attention and inquiry by federal authorities, state authorities, industry groups, and the press.  See N.T. 2/19/08 at 163; see also N.T. 2/22/08 at 6-8, 21.

113.    A 2003 regulatory release by the SEC entitled "Proposed Rule: Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings," 68 Fed. Reg. 70402 (Dec. 17, 2003) (the "SEC Market Timing Release") discusses a number of problems that mutual fund market timing may cause under some circumstances.  The SEC Market Timing Release discusses market timing in the context of both mutual funds and variable insurance contracts (such as the Contract at issue in this action) that offer investment options involving underlying mutual funds.  See 68 Fed. Reg. at 70402-70404.

114.    Prudential understood the SEC Market Timing Release to identify a

32

number of potential harms to a mutual fund's shareholders and to the owners of

variable insurance contracts that market timing can cause, including among other

things: (a) dilution of the value of long-term shareholders' interests; (b) causing

mutual funds to manage their portfolios in a disadvantageous manner because of

the need to maintain liquidity to meet redemption requests; and (c) increased

brokerage and administrative costs. 68 Fed. Reg. at 70404; see also N.T. 2/22/08

at 12-16.

     115.   It was Prudential's understanding that the SEC has recognized that:

> "Many mutual funds have taken steps to discourage
> market timing. These steps may include, for example:
> … *[r]estricting exchange privileges, for example, by*
> *restricting exchange requests submitted through a*
> *particular medium, such as telephone or facsimile*
> *transmission*, or received after a certain time of day, or
> by delaying both the redemption and purchase sides of
> an exchange."

68 Fed. Reg. at 70404 (emphasis added); see also N.T. 2/22/08 at 13, 15-17.

     116.   According to the SEC Market Timing Release, other steps mutual

funds have taken to discourage market timing include:

- Imposing redemption or exchange fees on shares that
  are redeemed or exchanged within a certain time
  period following their purchase;

- Restricting frequent trading, for example, by limiting
  the total number of exchanges that an investor may
  make within a certain time period, or by limiting the
  number of 'round trip' transactions where an investor
  purchases shares of a fund, exchanges those shares for
  shares of a different fund, and then exchanges back

into the originally purchased fund;

- Delaying the payment of the proceeds from the redemption of fund shares for up to seven days; and

- Identifying market timers and restricting their trading privileges or expelling them from the fund.

68 Fed. Reg. at 70404 (footnote omitted).

117.   Mutual funds underlying subaccounts available to owners of Prudential variable insurance contracts ("Underlying Funds") have acted to curtail market timing.  See N.T. 2/22/08 at 31-33.

118.   Pursuant to SEC Rule 22c-2, 270 C.F.R. § 270.22c-2, Underlying Funds require Prudential to inform them of what steps Prudential has taken to limit market timing of that fund.  See N.T. 2/22/08 at 33.

119.   It is Prudential's understanding that some Underlying Funds may refuse to accept trades that involve what they perceive as excessive market timing. See N.T. 2/22/08 at 32, 38, 98-100.

120.   Some Underlying Funds have sought explanations from Prudential concerning apparent market timing activities in the fund.  See N.T. 2/22/08 at 8-9, 31-32, 55.

121.   In the intervening years since the Contract was formed, the Pruskys have become aware of increasing hostility by the SEC, the NASD, state regulators, and the mutual fund and variable insurance product industries towards market timing.  See N.T. 2/19/08 at 162-164, 166-170; see also N.T. 8/22/07 at 21-22.

34

122.    The Pruskys were subpoenaed by the SEC in January 2004 in connection with their market timing activities.  See N.T. 2/19/08 at 163-164.

**H.    Prudential's Revision Of Its Transfer Policies**

123.    In December 2003, Prudential adopted new policies and procedures effective January 1, 2004, regarding the methods by which a variable life insurance contract owner could make transfers among the contract's investment options.  See N.T. 2/22/08 at 38-40.

124.    Under the New Transfer Policies, each calendar year, a contract owner may make up to twenty transfers by telephone, facsimile, electronic means, or by mail.  After the 20th transfer in a calendar year, the owner may continue to make transfers, but they must submitted by mail and bear an original signature in ink.  See N.T. 2/22/08 at 40.

125.    The New Transfer Policies apply to all owners of SVUL contracts. The New Transfer Policies also apply to all owners of most other types of retail variable life insurance contracts issued by Prudential that are registered as securities under the federal securities laws.  See N.T. 2/22/08 at 44-46.

126.    Prudential did not file an endorsement to the Contract with state authorities with respect to the New Transfer Policies because the Contract provided Prudential with the discretion to determine the form in which it accepted transfers.  See N.T. 2/21/08 at 116.

127.    Prudential adopted the New Transfer Policies to discourage market

timing in variable life insurance contracts.  <u>See</u> N.T. 2/22/08 at 42.  Prudential

acted to discourage market timing to forestall complaints from the mutual funds in

which Prudential contract holders may invest their contract funds.  <u>Id.</u> at 8-9, 31-

33.  In addition, the regulatory environment had changed since 1997.  Since 2003,

the SEC has shown a renewed interest in encouraging insurance companies and

mutual funds to deter market timing, as demonstrated by its adopting of SEC Rule

22c-2 under the Investment Company Act of 1940, 17 C.F.R. § 270.22c-2.  <u>See</u>

N.T. 2/22/08 at 6-10, 12.  Prudential also believed that it would be at a competitive

disadvantage if it did not discourage market timing because the vast majority of

existing and prospective contract owners wanted variable insurance products free

from any potential risks associated with market timing.  <u>See</u> N.T. 2/22/08 at 8-9,

30-31.

     128.    In December 2003, just prior to adoption of the New Transfer

Policies, Prudential had approximately 1.4 million in-force life insurance contracts.

Fewer than 25 had made more than 20 transfers the previous year.  <u>See</u> N.T.

2/22/08 at 45-46.

     129.    The New Transfer Policies were not adopted to prevent market

timing by the Pruskys specifically.  <u>See</u> N.T. 2/22/08 at 44-46.

## III. CONCLUSIONS OF LAW

### A.    Choice of Law

1.     A federal court sitting in diversity must apply the conflict of law rules of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Under Pennsylvania choice of law rules, claims arising from an insurance policy are governed by the law of the state in which the policy was delivered. CAT Internet Servs., Inc. v. Providence Wash. Ins. Co., 333 F.3d 138, 141 (3d Cir. 2003).  This case involves an alleged breach of a variable life insurance contract delivered in Pennsylvania.  Therefore, the applicable state law is that of Pennsylvania.

2.     In addition, variable life insurance contracts are regulated under federal securities law and are also subject to state regulation as insurance. Accordingly, this case is governed by Pennsylvania common law, Pennsylvania statutes governing insurance (Title 40 of the Pa. Cons. Stat. Ann.), and federal securities law.  Federal securities law includes, among other things, the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq., and SEC regulations issued thereunder.

### B.    Issue Preclusion

3.     To determine whether issue preclusion applies based on a prior decision issued by a federal court, the court applies the federal law of issue preclusion.  Peloro v. United States, 488 F.3d 163, 175 n.11 (3d Cir. 2007);

Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 145 (3d Cir. 1999) (we should apply the general federal rule that the preclusive effects of prior cases are determined by the law of the prior forum); In re Docteroff, 133 F.3d 210, 214 (3d Cir. 1997) (because the prior judgment was rendered by a federal court, we apply federal principles of collateral estoppel).

4.      "To invoke issue preclusion, it must be established that:  '(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the part against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.'" Prudential v. Prusky, 413 F. Supp. 2d 489, 493 (E.D. Pa. 2005) (the "July 22, 2005 Decision") (quoting Board of Trs. v. Centra, 983 F.2d 495, 505 (3d Cir. 1992)).

**C.      The Applicable Rules of Contract Interpretation**

5.      "Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'" Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001) (quoting Krizovensky v. Krizovensky, 425 Pa. Super. 204, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)); see also Southport Teledata, Inc. v. Nova Contact Center Platforms, Inc., No. 05-0030, 2006 U.S. Dist. LEXIS 61794, *20 (E.D. Pa. Aug. 30, 2006) (under Pennsylvania law, the writing itself is presumed to contain the mutual intent of the parties to a written contract).

6.     Therefore, when a written contract is clear and unequivocal, its meaning must be determined by its contents alone.  Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980).  Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract.  Bohler-Uddeholm, 247 F.3d at 93 (quoting Krizovensky, 624 A.2d at 642).

7.     This rule applies with particular force where, as here, the contract contains an integration clause.  See Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1299 (3d Cir. 1996); Greenberg v. Tomlin, 816 F. Supp. at 1039, 1052; Lenzi v. Hahnemann Univ., 664 A.2d 1375 (Pa. Super. Ct. 1995).  The Contract is integrated and consists only of the policy and the attached copy of the application.  See July 22, 2005 Decision, 413 F. Supp. 2d at 495; see also Feb. 8, 2007 Decision, 473 F. Supp. 2d at 633.  That issue was previously litigated and decided before Judge Schiller, and the Pruskys are bound by that holding.

8.     "[B]ecause Pennsylvania presumes that the writing conveys the parties' intent, a contract 'will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.  A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends;

and a contract is not rendered ambiguous by the mere fact that the parties do not

agree on the proper construction.'" Bohler-Uddeholm, 247 F.3d at 93 (quoting

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir.

1995)); see also Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294,

300 (3d Cir. 2002).

9.      "To determine whether ambiguity exists in a contract, the court may

consider 'the words of the contract, the alternative meaning suggested by counsel,

and the  nature of the objective evidence to be offered in support of that

meaning.'" Bohler-Uddeholm, 247 F.3d at 93 (quoting Mellon Bank, N.A., 619

F.2d at 1011).

10.      "Ambiguity in a contract can be either patent or latent.  While a

patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises

from extraneous or collateral facts which make the meaning of a written agreement

uncertain although the language thereof, on its face, appears clear and

unambiguous.'" Bohler-Uddeholm, 247 F.3d at 93 (quoting Duquesne Light, Co.

66 F.3d at 614).

11.      As such, the Third Circuit has held that "[a] party may use extrinsic

evidence to support its claim of latent ambiguity, but this evidence must show that

some specific term or terms in the contract are ambiguous; it cannot simply show

that the  parties intended something different that was not incorporated into the

contract.  'Lest the ambiguity inquiry degenerate into an impermissible analysis of

40

the parties' subjective intent, such an inquiry appropriately is confined to "the

parties linguistic reference."  The  parties' expectations, standing alone, are

irrelevant without any contractual hook on which to pin them.'"

Bohler-Uddeholm, 247 F.3d at 93 (quoting Duquesne Light Co., 66 F.3d at 614,

n.9).

      12.    "Furthermore, the alternative meaning that a party seeks to ascribe to

the specific term in the contract must be reasonable; courts must resist twisting the

language of the contract beyond recognition.  'In holding that an ambiguity is

present in an agreement, a court must not rely upon a strained contrivancy to

establish one; scarcely an agreement could be conceived that might not be

unreasonably contrived into the appearance of ambiguity.  Thus, the meaning of

language cannot be distorted to establish the ambiguity.'"  Bohler-Uddeholm, 247

F.3d at 93 (quoting Steuart v. McChesney, 444 A.2d  659, 663 (Pa. 1982)).  The

Third Circuit has emphasized that "any use of extrinsic evidence to support an

alternative interpretation of facially ambiguous language must be careful not to

cross the point at which 'interpretation becomes alteration of the written

contract.'"  Bohler-Uddeholm, 247 F.3d at 94 (citation omitted).

      13.    Thus, where a party seeks to use extrinsic evidence to show that a

contract is ambiguous, "the key inquiry" is "whether the proffered extrinsic

evidence is about the parties' objectively manifested 'linguistic reference'

regarding the terms of the contract, or is instead merely about their expectations."

Bohler-Uddeholm, 247 F.3d at 94, n.3 (citation omitted).  "Put another way,"

extrinsic evidence can be used to establish an ambiguity only if it will support "'a

reasonable alternative semantic reference' for specific terms contained in the

contract."  Id. (citation omitted).  The Third Circuit has condensed these rules of

Pennsylvania contract interpretation as follows:

> "To summarize:  a contract that is unambiguous on its
> face must be interpreted according to the natural
> meaning of its terms, unless the contract contains a
> latent ambiguity, whereupon extrinsic evidence may be
> admitted to establish the correct interpretation.
> However, a claim of latent ambiguity must be based on
> a 'contractual hook':  the proffered extrinsic evidence
> must support an alternative meaning of a specific term
> or terms contained in the contract, rather than simply
> support a general claim that the parties meant
> something other than what the contract says on its face.
> In other words, the ambiguity inquiry must be about
> the parties' 'linguistic reference' rather than about their
> expectations.  Furthermore, a proffered alternative
> meaning for the contractual hook must be reasonable;
> that is, it must be supported by contractual evidence
> that goes beyond the party's claim that the contractual
> hook has a certain meaning, and the interpretation
> cannot contradict the standard meaning of a term when
> the parties could have easily used another term to
> convey this contradictory meaning.  In determining
> whether latent ambiguity exists in a facially
> unambiguous contract, a court must consider whether
> the extrinsic evidence that the proponent of the
> alternative interpretation seeks to offer is the type of
> evidence that could support a reasonable alternative
> interpretation of the contract, given the foregoing
> principles."  Bohler-Uddeholm, 247 F.3d at 96
> (citation omitted).

14.    Where the application of these rules fails to establish any genuine

42

ambiguity in the contract's written terms, then the contract "must be determined by its contents alone" and not by reference to any extrinsic evidence.

Bohler-Uddeholm, 247 F.3d at 92 (citation omitted); see also Glenn Distributors Corp., 297 F.3d at 300 ("It is well-settled under Pennsylvania contract law that a meaning of a clear and unambiguous written contract and the intent of the contracting parties must be determined from the four corners of the contract").

15.     If, however, application of these rules establishes a genuine ambiguity in the contract's written terms, that is, "where the contract terms are ambiguous and susceptible of more than one reasonable interpretation," then "the court is free to receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity."  Bohler-Uddeholm, 247 F.3d at 93 (quoting Krizovensky, 624 A.2d at 642); see also Glenn Distributors Corp., 297 F.3d at 300.

### D.     The Contract Is Unambiguous and Is Not Violated by the New Transfer Policies

16.     The issue here is whether Prudential breached the Contract by adopting the New Transfer Policies under which, after the first 20 transfers in a calendar year, each transfer request must "bear an original signature in ink" and be "sent to us by U.S. regular mail."

17.     Under Pennsylvania law, the first step in answering this question is to determine whether the relevant provisions of the contract are clear and unambiguous.

**(1)    The Contract Terms Are Unambiguous on their Face**

18.    The provisions of the Contract relevant to this issue are clear and unambiguous.  Specifically, the Transfers section of the Contract states in pertinent part that  "[t]o make a transfer, you must ask us in a form that meets our needs." This sentence directly addresses the issue in dispute, i.e., the form in which a transfer request may be submitted, by expressly stating that the transfer request must be made in the form that Prudential directs.  The words of this sentence are clear and unambiguous on their face.

19.    This court has previously held that the Contract provision stating that "[t]o make a transfer, you must ask us in a form that meets our needs" on its face gives Prudential "complete discretion to define the manner in which transfer requests are  to be submitted."  See July 22, 2005 Decision, 413 F. Supp. 2d at 493.

20.    This conclusion is also supported by the fact that the Transfers section of the Contract further expressly provides that "[u]nless otherwise restricted, the transfer will take effect on the date we receive your notice at our Home Office."  This sentence, which immediately follows the sentence giving Prudential complete discretion over the required form of the transfer request, makes clear the day Prudential *receives* a transfer request may be different than the day that the request is *sent*.  Notably, the Contract does not guarantee that transfers will take effect "on the date requested."  By further providing that the effectuation

44

of transfers can be "otherwise restricted" even past the date of receipt, the Contract "expressly provides [that Prudential may impose] restrictions on when the transfer will take effect."  Prusky v. Prudential Ins. Co. of Am., Order on Reconsideration, 2001 U.S. Dist. LEXIS 24189, at *2 (E.D. Pa. Dec. 3, 2001) (the "Prior Order on Reconsideration").  The parties litigated this precise issue in the prior suit, the other elements of issue preclusion are satisfied here, and thus the Pruskys are precluded from relitigating it.

21.   The Pruskys argue that, as investors in Class One investments, they are not subject to any form of transfer restrictions.  As this court has previously held, however, that argument is refuted by the plain terms of the Contract.  See Feb. 8, 2007 Decision, 473 F. Supp. 2d at 636.  The above-referenced contract provisions, including the provision that "[t]o make a transfer, you must ask us in a form that meets our needs," expressly apply to all classes of investments, including Class One.  "Placing less restrictions on Class One investors, as opposed to Class Two or Three investors, does not mean that Prudential has placed no restrictions on Class One investors."  Id.  Accordingly, the court granted Prudential's motion in limine to exclude the Pruskys from submitting evidence or argument that they are not subject to any restrictions on Class One investments.  See Aug. 22,  2007 Order (Document #117).  The Pruskys also argued in the case before Judge Schiller that Class One investments are not subject to any restrictions.  See Pruskys' Motion for Amendment of Findings of Fact, Conclusions of Law, and

Judgment (Document #91 in the Prior Lawsuit).  Judge Schiller rejected this argument.  See Prior Order on Reconsideration, 2001 U.S. Dist. LEXIS 24189.  All elements of issue preclusion apply here, and the Pruskys are precluded from relitigating this issue.

22.     The Pruskys also argue that the Contract is ambiguous because they understand the phrase "in a form that meets our needs" to refer to the paper form on which contract holders can submit transfer requests.  However, the construction the Pruskys advance is not reasonable, as the provision states "*in* a form" not "*on* a form."  "[M]ere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous."  Bohler-Uddenholm, 247 F.3d at 94.

23.     Accordingly, I conclude that the Contract unambiguously gives Prudential the right to specify that the form in which transfer requests after the 20th in a calendar year are requested includes that they bear an original signature in ink and be submitted via U.S. regular mail.

### (2)     The Proffered Extrinsic Evidence Does Not Establish a Latent Ambiguity in the Contract Terms

24.     The Pruskys seek to proffer extrinsic evidence purportedly showing that Prudential promised the Pruskys the right to make instantaneous daily transfers.  Under Pennsylvania law as set forth in the Third Circuit's decision in Bohler-Uddeholm, in order for extrinsic evidence to establish an ambiguity, "the

proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract," and the "proffered alternative meaning for the contractual hook must be reasonable" and "cannot contradict the standard meaning of a term."  247 F.3d at 96.

25.    The Pruskys' proffered extrinsic evidence does not establish any ambiguity in the contract.  First, the proffered evidence does not support any reasonable alternative meaning of any specific term or terms of the Contract. There are no specific terms of the Contract that can reasonably be interpreted to state that the Pruskys have the right to make transfer requests through an instantaneous form of communication.  Second, the Pruskys' proffered evidence would contradict the standard meaning of a term of the contract, namely, the term expressly and unambiguously stating that any transfer request must be made in the form that Prudential specifies.

26.    Because the Pruskys' proffered evidence does not establish an ambiguity in any specific term or terms of the Contract, that evidence is inadmissible and the Contract must be interpreted in accordance with its plain and unambiguous terms.

27.    The terms of the Contract are clear and unambiguous, and Prudential's New Transfer Policies do not violate those terms.

**E.**     **If the Extrinsic Evidence Were Credited, Prudential's**
          **New Transfer Policies Do Not Violate the Contract**

28.     In the alternative, if the extrinsic evidence could be used to
supplement or contradict the written terms of the Contract, the extrinsic evidence
in this case does not support the Pruskys' position because (1) the extrinsic
evidence establishes that Prudential repeatedly refused to give the Pruskys the
right to make transfers through an instantaneous means of communication, and (2)
because the New Transfer Policies are fully consistent with the statement in the
September 18, 1997 letter that "daily transfers are allowed throughout the life of
the contract."

29.     "In ascertaining the intent of the parties to a contract, it is their
outward and objective manifestations" of intent, "as opposed to their undisclosed
and subjective intentions, that matter."  Ingrassia Constr. Co. v. Walsh, 486 A.2d
478, 483 (Pa. Super.  Ct. 1984); see also Prior Decision, 2001 U.S. Dist. LEXIS
24080, at *70.  The only extrinsic evidence that could be considered in any event
would be evidence of the parties' manifested intent, not their undisclosed views.

30.     The Van Pelts acted as the Pruskys' agents for the formation of the
Contract.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *14, *18.
This issue was litigated and decided in the suit before Judge Schiller and the
Pruskys are bound by that holding.  Id.

31.     Because the Van Pelts were the Pruskys' agents for the negotiation

48

of the Contract, all information known to the Van Pelts at the time of Contract formation is imputed to the Pruskys.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *13-14; see also Feb. 8, 2007 Decision, 473 F. Supp. 2d at 631. That issue was litigated and decided in the Prior Lawsuit and the Pruskys are bound by that holding.

32.    The Contract was formed on November 8, 1997.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *11, *18.  That issue was litigated and decided in the Prior Lawsuit and the Pruskys are bound by that holding.  Id.  All negotiations and writings prior to that date are pre-contractual extrinsic evidence.

### (1)    The extrinsic evidence establishes that the Contract does not include a right to make transfer requests by instantaneous communication

33.    The extrinsic evidence establishes that Prudential expressly refused the Pruskys' request that the Contract include a provision guaranteeing that they could submit transfer requests by a means of instantaneous communication, and that the Pruskys were aware of that refusal prior to formation of the Contract.

34.    The Van Pelts knew that Prudential was not promising and would not promise that the Pruskys could submit transfer requests by facsimile, telephone, or by some other means of instantaneous technology for the life of the Contract, and that knowledge is imputed to the Pruskys.  Prudential notified the Van Pelts on September 15, 1997 that it could not make the requested guarantee that the Pruskys could submit transfer requests by telephone and facsimile because

49

Prudential might need to change the means by which it permitted contract holders to submit transfer requests for "legal, technological, or business reasons."  It reconfirmed this position in signed letters on September 16 and September 18, 1997.  Since telephone and facsimile were the only instantaneous means of submitting transfer requests that Prudential accepted at the time of contract formation, Prudential's rejection of both means effectively communicated that no instantaneous means of submitting transfer requests would be guaranteed.

35.    The Van Pelts probed the nature and breadth of Prudential's rejection of the Pruskys' request for instantaneous means of submitting transfer requests when they asked Prudential, in the alternative, to guarantee the Pruskys' access to "successor technology" for submitting their transfer requests to Prudential.  By rejecting that alternative, Prudential confirmed, consistent with its statements that it might change its practices for "legal*, technological, or business reasons*, that concerns about technological obsolescence were not the sole reasons for refusing to commit to telephone and facsimile means of submitting transfer requests.

36.    The Pruskys' agents, the Van Pelts, participated in all of these negotiations and received all of these communications.  The Pruskys therefore had imputed knowledge of these negotiations and Prudential's ultimate refusal to promise that the Pruskys could use telephone, facsimile or successor technology to communicate transfer requests for the life of the contract.

37.    In addition to their imputed knowledge, the Pruskys had actual

50

knowledge that Prudential did not and would not promise that the Pruskys would be able to make transfers by facsimile, telephone or any other instantaneous means of communication.  The September 18, 1997 letter stated that although Prudential's current practice was to accept transfers submitted by facsimile and by telephone, and to use 4:15 p.m. as the cutoff time for such transfers, there might "come a time when a modification to our practices would be made due to legal, technological or business reasons."  The Pruskys received the September 18, 1997 letter.  See Nov. 17, 2005 Decision, 2005 U.S. Dist. LEXIS 28676, at *17-18.  That issue was litigated and decided in the Prior Lawsuit and the Pruskys are bound by that holding.  Id.

38.    The Pruskys also understood that the request for a guarantee as to "successor technology" was essentially a catch-all encompassing any other means of instantaneous communication Prudential might make available in the future.  Consequently, the Pruskys knew or should have known that in rejecting every means of instantaneous communication they requested, including successor technology, Prudential had refused to commit to any means of instantaneous communication.

39.    In sum, the extrinsic evidence establishes that the Contract did not include a right to submit transfers *via* instantaneous communication, because the Pruskys' request that such a provision be included in the Contract was refused by Prudential, and the Pruskys were aware of that refusal prior to Contract formation.

  **(2)**  **The extrinsic evidence establishes that any asserted**
       **promise to allow "daily transfers" did not include the**
       **right to make transfers by  instantaneous communication**

  40.  As this court has previously recognized, the Contract "does not

specify the frequency with which transfers may be effectuated, nor the available

means of transmitting transfer requests."  See July 22, 2005 Decision, 413 F. Supp.

2d at 493.  Thus, "daily transfers" was not a term of the Contract.  Nonetheless, the

September 18, 1997 letter states that "daily transfers are allowed throughout the

life of the contract."  The court concludes that the parties understood "daily

transfers" to refer to frequency, that is, the ability to send transfer requests on a

daily basis, and that Prudential's New Transfer Policies are consistent with that

understanding.

  41.  The Pruskys contend, however, that neither Prudential's refusal to

guarantee a right to submit transfer requests by telephone and facsimile, the only

instantaneous methods for submitting transfer requests that Prudential accepted at

the time, nor its refusal to guarantee the Pruskys' use of successor technology took

away their right to "some" instantaneous means of communicating their transfer

requests.  That right, they now contend, is "inherent" in the meaning of the phrase

"daily transfers."  But the extrinsic evidence demonstrates that the Pruskys and

their agents understood that any purported right to daily transfers was separate

from the right to submit transfer requests through an instantaneous means of

communication.  In particular, Steven Prusky's September 4, 1997 letter to Van

52

Pelt III stated that "[w]hile this section guarantees daily transfers, it does not explicitly guarantee daily telephone transfers." See Def. Ex. 44. This demonstrates that he did not believe that "daily transfers" carried with it a right to an instantaneous means of submitting the transfer, or, at the very least, that he understood that Prudential might not understand the phrase to carry with it that right. Likewise, the Van Pelts asked Prudential to change the sentence "Daily transfers will be allowed throughout the life of the contract" to "Daily telephone, written and facsimile transfer requests will be allowed throughout the life of the contract," see Def. Ex. 45, thereby indicating that the phrase "daily transfers" alone was insufficient to convey the means as well as the frequency.

42.     The extrinsic evidence likewise establishes that Prudential treated the right to daily transfers as completely different than the right to transmit transfer requests *via* a form of instantaneous communications. In the September 18, 1997 letter, Prudential stated that "daily transfers will be allowed throughout the life of the contract," but then immediately stated in the next two sentences that it could not guarantee that it would make facsimile and telephone transfers available for the life of the Contract, and that it might change its practices for "legal, technological, or business reasons." Because they received this letter, the Pruskys were or should have been aware that Prudential's statement regarding "daily transfers" did not include an implied promise to allow transfers by instantaneous communication.

43.     Under Pennsylvania law, the Pruskys' knowledge, in advance of

contract formation, that Prudential interpreted the contract terms as not providing a right to make transfer requests by instantaneous communications requires that the Contract be construed in accordance with Prudential's stated interpretation.  As the Third Circuit has held under Pennsylvania law, "it is a central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation."  Bohler-Uddeholm, 247 F.3d at 99.

44.    The Pruskys' conduct in their negotiations with other insurance companies further demonstrates that they understood that being able to trade daily did not guarantee them the right to make trading requests by instantaneous means. In their negotiations with other insurance companies, including Hancock, Phoenix Life, ReliaStar, and Aetna, the Pruskys sought separate guarantees that they be able to trade each day and that they be able to do so by electronic means such as telephone or facsimile, just as they did here.  This confirms that the Pruskys were aware that any right in the Contract to make daily transfers without numerical limit did not by itself include or create the right to submit transfer instructions by instantaneous means.

### (3)    Trade Usage

45.    The Pennsylvania Supreme Court has held that "[w]here terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the

54

purpose of applying the instrument to its proper subject matter." Resolution Trust Corp. v. Urban Redevelopment Auth., 638 A.2d 972, 975 (Pa. 1994).

46.     The practice within the variable insurance industry and the mutual fund industry was to preserve flexibility to restrict transfers through various means.  One of those means was to preserve the ability to restrict the medium by which transfers might be submitted.

47.     The Pruskys were sophisticated investors who frequently used insurance contracts as an investment tool.  As such, they were aware of these industry practices.

48.     Accordingly, the Pruskys were aware that, consistent with trade usage, the provision of the Contract stating that "[t]o make a transfer, you must ask us in a form that meets our needs" gave Prudential flexibility to, among other things, restrict at any future time the medium by which transfers could be submitted to Prudential.

49.     Moreover, the Pruskys were aware that the phrase "daily transfers" was not a term of art and had different meanings to different people.

### (4)     Public Policy

50.     Any ambiguity in the Contract concerning whether Prudential has the right to place restrictions on the manner in which transfers may be submitted must be construed in Prudential's favor because Prudential is entitled to construe the Contract in a way that does not contravene established public policy.

51.     Prudential's adoption of the New Transfer Policies is supported by public policy and furthered the public interest.  The SEC takes a dim view of market timing:

> "Market timing, while not illegal *per se*, can harm other fund shareholders because (a) it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, (b) it can disrupt the management of the fund's investment portfolio, and (c) it can cause the targeted fund to incur costs borne by other shareholders to accommodate the market timer's frequent buying and selling of shares."  Mutual Fund Redemption Fees, SEC Release. No. IC-26782, 70 Fed. Reg. 13328 n.4 (Mar. 18, 2005) (adopting final regulations).

Accordingly, the SEC adopted Rule 22c-2 under the Investment Company Act of 1940, 17 C.F.R. § 270.22c-2, effective in amended form on December 4, 2006 and April 16, 2007.  Rule 22c-2 expressly requires mutual funds and "financial intermediaries" (including the "unit investment trust" that holds the shares of the mutual funds on behalf of the Contract at issue here) to take steps to protect mutual fund shareholders from potential harm caused by market-timers. Rule 22c-2 requires that Prudential must agree with the underlying funds to "restrict or prohibit further purchases or exchanges of fund shares by a shareholder who has been identified by the fund as having engaged in transactions of fund shares (directly or indirectly through the intermediary's account) that violate policies established by the fund for the purpose of eliminating or reducing any dilution of the value of the outstanding securities issued by the fund."  Rule 22c-2(a)(2), (c)(5)(ii), 17 C.F.R. § 270.22c-2(a)(2), (c)(5)(ii).  Furthermore, the

56

SEC has recognized and condoned "restrictions imposed on exchange or purchase requests submitted … electronically, or via facsimile or telephone," in order to discourage market timing, which is precisely what Prudential has done here.  See "Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings," 69 Fed. Reg. 22300, 22313 (Apr. 23, 2004) (adopting final regulations); see also id. at 22304 (making the disclosure requirements for such restrictions on market timing applicable to variable insurance contracts like the Contract).  The steps Prudential took to discourage market timing promote this public policy, and any ambiguity in the Contract should be resolved to permit those steps.

### (5)      Course of Performance

52.     The Pruskys argue that Prudential's course of performance is evidence that the Contract permits daily trades by facsimile or other electronic means.  The Pruskys made substantially the same argument during the Prior Lawsuit with respect to Prudential's permitting them to submit transfers until 4:15 p.m. each day.  Judge Schiller rejected that argument:

> "Prudential's course of performance does not alter the terms of the  Contract.  It is undisputed that the Valuation Time of the Sub-accounts was 4:15 p.m. in 1997 and continued at that time until 2000, when it changed to 4:00 p.m.  The issue, however, is not *what* the Valuation Time was, but rather whether there was a promise not to *change* it.  Prudential stated in September 1997 that it had no current intention of changing the Valuation Time but that it might do so in

> the future for 'legal, technological or business
> reasons.'  The fact that a 4:15 p.m. Valuation Time
> was observed for two years sheds no light on whether
> that was merely a continuation of the existing practice
> or whether Prusky had a contractual right to the permanence of that Valuation Time."

See Prior Decision, Conclusion of Law 24, 2001 U.S. Dist. LEXIS 24080, at *72.

53.     The same analysis applies here.  It is undisputed that Prudential did not place any restrictions on the means by which the Pruskys could make transfer requests or the number of transfers the Pruskys could make by facsimile or telephone from 1997 until January 1, 2004, when Prudential imposed the New Transfer Policies.  The issue, however, is not what types of transfers Prudential accepted, but rather whether Prudential promised not to impose such restrictions in the future.  Prudential stated in September 1997 that it had no current intention of changing its practice of accepting telephone and facsimile transfers, but that it might do so in the future for "legal, technological or business reasons."  The fact that Prudential allowed facsimile and telephone transfers for six years sheds no light on whether that was merely a continuation of the existing practice or whether Prusky had a contractual right to make such transfers.

**(6)     The Reasonable Expectations Doctrine**

54.     The Pruskys may not avoid the terms of the Contract under the reasonable expectation exception to the plain meaning rule for insurance contracts. See Bowersox Truck Sales & Serv., Inc. v. Harco Nat'l Ins. Co., 209 F.3d 273, 278-79 (3d Cir. 2000); see also Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38

F.3d 1303, 1309-11 (3d Cir. 1994) (citing Tonkovic v. State Farm Mut. Ins. Co.,

521 A.2d 920 (1987)).  The reasonable expectation of the insured must be

examined in light of the totality of circumstances behind the insurance transaction.

See Bowersox Truck Sales, 209 F.3d at 278-79.

55.    First, no provision of the Contract itself could have given rise to any

reasonable expectation of an instantaneous means of communicating transfer

requests.  To the contrary, as noted above, the Contract expressly provided that

Prudential retained complete discretion over the form of the transfer, and the

Pruskys were aware that, consistent with trade usage, that meant that Prudential

could limit the means of making transfer requests.

56.    Moreover, the extrinsic evidence specifically negates any argument

that the Pruskys had a reasonable expectation that the Contract guaranteed an

instantaneous  form of communication.  The Pruskys were aware (both actually

and by way of the Van Pelts' knowledge, which is imputed to them) that

Prudential had specifically refused their request to include a promise to

instantaneous transfers in the Contract.  Steven Prusky told the Van Pelts that daily

transfers were not enough; he needed daily telephone transfers.  See Def. Ex. 44.

Moreover, the Pruskys' agents expressly asked Prudential to change the August 28

letter to guarantee (a) daily telephone, written and facsimile transfers (see Def. Ex.

45), and (b) successor technology to facsimiles (see Def. Ex. 60).  Prudential

refused to grant that request.  As such, the Pruskys could not have reasonably

expected that the Contract gave them such a right.

**(7)    The Necessary Implication Doctrine**

57.    The doctrine of necessary implication acts to "imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive  the fruits of the contract." Frickert v. Deiter Bros. Fuel Co., 347 A.2d 701, 705 (Pa. 1975) (Pomeroy, J. concurring).  The doctrine operates in the absence of an express contractual provision when the parties did not anticipate or form an understanding on an issue.  Id.

58.    The doctrine cannot be applied here to require Prudential to allow the Pruskys to make transfer requests by instantaneous means of communication. The Contract has a term that expressly addresses the form of the transfer request and that provides Prudential discretion to specify the form of that request.  Because an express contractual provision exists, no additional or contrary provision can be implied into the Contract.  Moreover, the extrinsic evidence shows that the Pruskys were well aware that the Contract did not guarantee them the right to submit transfer requests by an instantaneous means and elected to accept the Contract anyway.  As such, they cannot reasonably argue that they have been denied the fruits of the Contract as they expected them to be.

59.    The Pruskys contend that the doctrine of necessary implication

60

should apply because the parties did not expressly predict that someday in the future the SEC would take regulatory action with respect to market timing. The parties were not required to be this prescient. The parties mutually understood that circumstances could change. It was for this reason that the Pruskys asked for a lifetime guarantee with respect to the means of transfer, and Prudential expressly responded that it might change its practices for legal, technological or business reasons. That the parties did not necessarily anticipate the precise external change that led Prudential to adopt the New Transfer Policies does not alter the fact that both sides anticipated the possibility that circumstances could change.

### F.   <u>No Breach of Contract</u>

60.   For the reasons set forth above, the I find that Prudential's New Transfer Policies do not breach the Contract. Accordingly, Prudential is entitled to a declaratory judgment to that effect, and the Pruskys are entitled to no relief on their counterclaim.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE PRUDENTIAL INSURANCE** | : | **CIVIL ACTION** |
| **COMPANY OF AMERICA,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 04-0462** |
| | : | |
| **PAUL M. PRUSKY, et al.,** | : | |
| **Defendants** | : | |

## O R D E R

**STENGEL, J.**

     **AND NOW,** this  31st  day of March, 2008, upon consideration of the

trial testimony, the admitted exhibits, the deposition designations, and the parties'

proposed findings of fact and conclusions of law, it is hereby ORDERED that,

based upon my Findings of Fact and Conclusions of Law:

     1.    The plaintiff's request for declaratory judgment is GRANTED:  the
plaintiff's New Transfer Policies did not breach the Contract which is the subject
of this action;

     2.    The defendants' counterclaim for breach of contract is DENIED;

     3.    The defendants' motion for judgment on partial findings pursuant to
Federal Rule of Civil Procedure 52(c) (Document #139), and the plaintiff's oral
response thereto is DENIED.

     4.    Judgment is entered in favor of the plaintiff, and against the
defendants.

     The Clerk of Court is directed to mark this case CLOSED for all purposes.

                      BY THE COURT:


                       /s/ Lawrence F. Stengel
                      LAWRENCE F. STENGEL, J.